# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

———————————————————————

|  |  |  |
|---|---|---|
| SAFETY-KLEEN SYSTEMS, INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 1:18-cv-10645 |
| | ) | |
| DAVID G. WOODS, PENNSTAR, LLC, | ) | |
| and COOLANTS PLUS, INC., | ) | |
| | ) | |
| Defendants. | ) | |

———————————————————————

## MEMORANDUM IN SUPPORT OF PLAINTIFF SAFETY-KLEEN SYSTEMS, INC.'S MOTION FOR PRELIMINARY INUNCTION

**SAFETY-KLEEN SYSTEMS, INC.**

By its attorneys,

/s/ Patrick M. Curran, Jr.
Patrick M. Curran, Jr. (BBO# 659322)
Ogletree, Deakins, Nash, Smoak & Stewart, P.C.
One Boston Place, Suite 3500
Boston, MA 02108
Telephone: 617-994-5700
Facsimile: 617-994-5701
patrick.curran@ogletree.com

Dated: April 3, 2018

By accompanying Motion, Plaintiff Safety-Kleen Systems, Inc. ("Safety-Kleen," or the "Company") moves for a preliminary injunction prohibiting its former employee, David G. Woods, from further breaching his contractual obligations not to solicit business from Safety-Kleen's customers, and not to use or disclose Safety-Kleen's confidential and proprietary information. Safety-Kleen also seeks to restrain Woods's new employer, Defendant PennStar, LLC, and its parent company, Defendant Coolants Plus, Inc. ("CPI"), from continuing to interfere with its contractual and advantageous business relations with Woods and with Safety-Kleen's customers.

Woods was a trusted Safety-Kleen employee who, during his employment with the Company, was given responsibility for selling and marketing its blended lubricant products to customers and prospective customers in Massachusetts, New York, and several other states. As such, throughout his employment with Safety-Kleen, Woods had access to sensitive and confidential information concerning the Company's business and its customers, including sales data, sales and marketing strategies, customer contact and preference information, and other highly confidential business information. He also was responsible for cultivating, developing, and managing Safety-Kleen's relationships with many of its most valued customers. He thereby benefitted from and partook in its substantial preexisting goodwill with those customers.

In March 2017, Woods entered into a Confidentiality and Non-Solicitation Agreement with Safety Kleen. In that Agreement, Woods agreed that during his employment and for one year after his resignation or discharge for cause, he would not directly or indirectly solicit or attempt to solicit any Customer with whom he had Material Business Contact in the two years preceding the end of his employment. He also agreed that he would not at any time use or disclose the Company's Confidential Information or Trade Secrets.[1]

---

[1] As we explain below, "Customer," "Material Business Contact," "Confidential Information," and "Trade Secrets" are defined terms in Woods's Agreement with Safety-Kleen.

Woods resigned from his job with Safety-Kleen in December 2017. Shortly thereafter, and notwithstanding his clear, unmistakable, and legally binding commitments, Woods proceeded to solicit multiple Safety-Kleen customers with whom he had had substantial Material Business Contacts throughout his employment with the Company, and to use and disclose the Confidential Information that he had acquired about those customers through his employment with the Company. Specifically, in March 2017, Safety-Kleen obtained an e-mail communication between Woods and his managers at PennStar and CPI in which Woods recounted his efforts to solicit business from four of the customers he had been responsible for at Safety-Kleen, and also disclosed (and described his use of) confidential and proprietary Safety-Kleen information. In the e-mail, Woods not only brazenly admits that he is subject to restrictive covenants that forbid the activity he describes, but also sets forth how he intends to violate those obligations and evade detection. The evidence also shows that Woods falsified data in Safety-Kleen's computer systems in order to assist and effectuate his plan to impermissibly poach Safety-Kleen's customers for its competitors.

A preliminary injunction is clearly necessary to restrain Woods and his new employers from continuing to engage in this lawless conduct, and to protect Safety-Kleen from the continued use and disclosure of its confidential information and illegal solicitation of its customers. Without Safety-Kleen's proposed injunction, it will suffer the risk of substantial and irreparable harm both to its customer relationships and to the confidentiality of its information. Conversely, the injunction will cause no cognizable harm to the Defendants, since it merely requires them to abide by their contractual and common law obligations. Indeed, any harm that the Defendants could conceivably suffer if they are restrained from continuing to violate their legal obligations is far outweighed by the substantial harm that Safety-Kleen will suffer if they are permitted to continue doing so.

## Background

### A. Safety-Kleen and its competitors – CPI and PennStar.

Safety-Kleen is a leading provider of environmental services to commercial, industrial, and automotive customers. *See* Affidavit of Larry Cekella ("Cekella Aff.") at ¶ 4. The Company provides five principal types of services and products: base oils, blended lubricants, oil solutions, cleaning solutions, and environmental solutions. *See id.* at ¶ 5. Safety-Kleen is North America's largest collector, recycler, and re-refiner of used oil, and it is also the leading provider of parts cleaning services in North America. *See id.* at ¶ 4. CPI and PennStar – the latter of which is a subsidiary of the former – are suppliers of various types of industrial oils (e.g., motor oil, heavy duty engine oils, hydraulic oils, and gear oils), including CPI's Starfire-branded industrial oils, as well as industrial cleaners (e.g., machine cleaners, safety solvents, glass cleaners, and asphalt removers) and other products. *See id.* at ¶ 7; Affidavit of Patrick M. Curran, Jr. ("Curran Aff."), Exhs. 1-4. As such, both CPI and PennStar compete with Safety-Kleen in the business of providing oil solutions and cleaning solutions to distributors and other customers. Cekella Aff. at ¶ 8.

### B. Woods's employment and restrictive covenants agreement with Safety-Kleen.

Woods worked for Safety-Kleen as a Distributor Sales Executive from August 1, 2016, through December 22, 2017. *See* Cekella Aff. at ¶ 12. As a Distributor Sales Executive, Woods was responsible for selling and marketing the Company's blended lubricant products to distributors and other customers and potential customers of Safety-Kleen in Massachusetts, Connecticut, New York, and various other states. *See id.* at ¶ 13. In that capacity, furthermore, Woods not only had direct and regular access to and communications with the Company's customers, but he also had access to, regularly relied on, and was provided by Safety-Kleen with large quantities of the Company's most critically sensitive and commercially valuable confidential information and trade secrets. *See id.* at ¶ 14. That information included, without limitation, confidential and proprietary business information

concerning the Company's customers (including their preferences and requirements), its sales and marketing strategies, its sales records and marketing data, its business plans, and its technical expertise and know-how. *See id.* In particular, Woods had electronic access to Safety-Kleen's customer management system, SalesForce, which contained highly confidential and proprietary information about the Company's customers and prospective customers, including contact information for their key decision makers, information concerning the Company's marketing efforts with respect to them, and information concerning past sales made and pricing offered to and accepted by them. *See id.* at ¶ 15.[2] Safety-Kleen provided Woods not only with access to its SalesForce database, but also with the ability to add or update information concerning the Company's customers and prospective customers – and it instructed, expected, and relied on him to do so accurately, completely, and in good faith. *See id.* at ¶ 17.

On or about March 21, 2017, in consideration of his continued employment with the Company – and of the Company's offer to allow Woods to participate in its 2017 Kleen Performance Products Variable Pay Plan, its promise to disclose to him its confidential information and trade secrets, and other consideration – Woods executed a Confidentiality and Non-Solicitation Agreement (the "Agreement") in which he acknowledged the confidential and proprietary nature of the information to which he would have access as a Safety-Kleen employee, as well as the highly competitive nature of the business in which Safety-Kleen was engaged. *See* Cekella Aff., ¶ 18 & Exh. 1 at 1, 5. As part of the Agreement, furthermore, Woods agreed to certain covenants that were expressly designed and intended to protect the Company's assets, including its confidential information, its trade secrets, and its goodwill and business relationships with its customers. *See id.*,

---

[2] The Company's SalesForce database is, and at all relevant times was, password-protected, so that only employees with a business need for the information contained in the database could access it; and even those employees with access to the system are (and at all relevant times were) only provided with access to information and records about those customers whose information they have a business need for. *See* Cekella Aff. at ¶ 16.

Exh. 1 at 1, 3-5.[3] Those covenants included, specifically, one in which Woods agreed that during his employment with Safety-Kleen and for one year following the voluntary resignation or termination with cause of his employment with the Company, he would not directly or indirectly "solicit, divert, or appropriate, or attempt to solicit, divert, or appropriate any Customer with whom [Woods] had Material Business Contact in the two (2) year period preceding the termination of [his] employment, for the purposes of providing services that are the same as or substantially similar to those provided in the Business" of the Company. *See id.*, Exh. 1 at 4 (Section 5).[4] Woods also agreed that he would not, at any time either during or after the term of his employment with the Company, directly or indirectly "use, disclose, reproduce, distribute, or otherwise disseminate" the Company's Confidential Information or Trade Secrets, or "take any action causing or fail to take any action necessary[] in order to prevent any such information to lose its character or cease to qualify as Confidential Information or a Trade Secret," except as authorized and required to perform his duties for the Company. *See id.*, Exh. 1 at 3 (Section 3).[5]

In the Agreement, Woods acknowledged and agreed that the restrictions set forth in the Agreement "are reasonably designed to protect" the Company's legitimate business interests, including its "goodwill and Customer relationships, Confidential Information and Trade Secrets, and the specialized skills and knowledge gained by [Woods]" and other Company employees during their employment. *See* Cekella Aff., Exh. 1 at 5 (Section 13). Woods further acknowledged and agreed that his breach of any provision of the Agreement "will cause serious and irreparable injury" to the Company "that will be difficult to quantify and which may not be adequately compensated by

---

[3] The Agreement was between Woods and Safety-Kleen's parent company, Clean Harbors. *See* Cekella Aff., Exh. 1 at 1. Clean Harbors is expressly defined in the Agreement to include the subsidiaries and affiliates of Clean Harbors, which included (and includes) Safety-Kleen. *See id.* at ¶ 6 & Exh. 1 at 1.

[4] The terms "Customers," "Material Business Contact," and "Business of" the Company are defined in the Agreement. *See* Cekella Aff., Exh. 1 at 1-3. As used herein, those terms have the meanings set forth there as to each such term.

[5] The terms "Confidential Information" and "Trade Secret(s)"are defined in the Agreement. *See* Cekella Aff., Exh. 1 at 2-3. As used herein, those terms shall have the meanings set forth as to each such term, respectively, in the Agreement.

monetary damages alone," and he thus agreed that "in the event of [his] breach or threatened or intended breach" of the Agreement, the Company would "be entitled to injunctive relief, both temporary and final, enjoining and restraining such breach or threatened or intended breach." *See id.*

### C. Woods's exposure to and work with Safety-Kleen customers.

In his capacity as a Distributor Sales Executive for Safety-Kleen, Woods was assigned responsibility for selling Safety-Kleen's products to, and managing Safety-Kleen's relationships with (among other entities) Circle Lubricants, Inc. ("Circle"), Total Lubricants USA Inc. ("Total"), ENI US Operating Co. Inc. ("ENI"), and Nu-Tier Brands, Inc. ("Nu-Tier"). *See* Cekella Aff. at ¶ 19. In the two years prior to the last day of Woods's employment with Safety-Kleen – i.e., during the period from December 22, 2015, to December 22, 2017 – Safety-Kleen provided products or services in connection with its Business (as that term is defined in the Agreement) to each of these four entities. *See id.* at ¶ 20; *see also id.*, Exh. 1 at 1-2 (Section 1(a)). Further, within the two years prior to the last day of his employment with Safety-Kleen, and in his capacity as a Distributor Sales Executive for the Company, Woods had multiple contacts with Circle, with ENI, with Total, and with Nu-Tier, each of which was intended to establish or strengthen a business or professional relationship for Safety-Kleen. *See* Cekella Aff., ¶ 20. Woods also had, in connection with and in furtherance of his performance of his job duties for the Company, access to (and Safety-Kleen provided him with) the Company's Confidential Information concerning Circle, ENI, Total, and Nu-Tier, and other Customers – including for example Information about the Company's past sales and pricing to those Customers, its marketing and sales efforts and strategies with respect to them, the contact information for their key decision makers, and information about each of their preferences and requirements with respect to products sold by the Company. *See id.* at ¶ 21. Likewise, as a Distributor Sales Executive for the Company, Woods was provided with access to and benefitted from the good will that Safety-Kleen had worked to acquire through its relationships

with Circle, ENI, Total, Nu-Tier, and other Customers – all of which had been well-established before Woods's employment with Safety-Kleen began. *See id.* at ¶¶ 22-24.

> **D. Woods resigns from his job at Safety-Kleen, takes a sales position with PennStar, a Safety-Kleen competitor, and solicits business from Safety-Kleen Customers on behalf of his new employer.**

On or about December 18, 2017, Woods informed Safety-Kleen that he was resigning voluntarily from his employment with the Company. *See* Cekella Aff. at ¶ 25. His last day of employment with Safety-Kleen was December 22, 2017. *See id.* at ¶ 26. In the days prior to his final day, Woods told his managers that he was leaving in order to do something "entrepreneurial," such as purchase part of a distributor. *See id.* That information was false, however; as Safety-Kleen subsequently learned, Woods had actually left the Company to work as a salesperson for its competitor, PennStar. *See id.*

In addition, on or about December 20, 2017 – i.e., two days before his last day of employment with Safety-Kleen – Woods logged into the Company's SalesForce database and falsely designated several of the Company's active Customers – including Circle, Total, and Nu-Tier – as "Inactive." *See* Cekella Aff. at ¶¶ 27-36; Affidavit of James P. Drozdowski ("Drozdowski Aff."), at ¶ 9 & Exh. 5. The "Inactive" designation, as Woods knew, was reserved for prospective or former customers from whom Company management had decided to cease expending resources to solicit business, and as to whom it had abandoned its sales efforts. *See id.* at ¶ 37. As Woods also knew, Safety-Kleen's management had not decided to abandon the Company's sales efforts with respect to Circle, Total, Nu-Tier, and the other customers that he designated as "Inactive" on December 20, 2017, and the Company had not in fact abandoned its sales efforts with respect to any of those customers. *See id.* at ¶ 38.

In March 2018, furthermore, Safety-Kleen learned that Woods had solicited business from the Company's Customers, on behalf of PennStar and in violation of his obligations to Safety-Kleen

under the Agreement. Specifically, on or about March 19, 2018, Safety-Kleen became aware of an e-mail communication that Woods had sent from his PennStar e-mail account on or about March 17, 2018, to Kurt Deimer, Darrin Ward, and Robert Perkins (the "March 17 e-mail"). *See* Cekella Aff. at ¶¶ 27-35; Drozdowski Aff., at ¶¶ 6-7 & Exh. 1. Deimer is the President and Chief Executive Officer of PennStar's owner, CPI, and is also the President of PennStar. *See* Cekella Aff., Exh. 2. Ward is CPI's Chief Operating Officer, and is also the Chief Financial Officer of PennStar. *See id.*, Exh. 3. Perkins is a former employee of Safety-Kleen who, like Woods, resigned voluntarily from his employment with the Company in December 2017 – his last day of employment with Safety-Kleen was the same day as Woods's last day of employment there, i.e., December 22, 2017 – and he is currently employed by PennStar. *See id.* at ¶ 28.

In the March 17 e-mail, Woods recounted to Deimer, Ward, and Perkins his efforts – in conjunction with Troy Ward, who is also employed by PennStar or CPI – to solicit business from various entities on behalf of PennStar and CPI. *See* Drozdowski Aff., Exh. 1. The entities from which Woods had solicited business, according to the account that he provided in the March 17 e-mail, included Circle, Total, ENI, and Nu-Tier. *See id.* With respect to his efforts to solicit business from Circle, Woods stated (among other things) that he had "needed Troy [Ward] here as I had to hide behind him due to Non-Compete." *See id.* He then went on to describe his efforts (through Ward) to solicit business from Circle on behalf of PennStar and CPI – in the course of which he disclosed to the recipients of the e-mail (including Deimer and Darrin Ward) confidential and proprietary Safety-Kleen information, including information about the Company's pricing history, sales and pricing strategies, and sales efforts with respect to Circle. *See id.*; Cekella Aff. at ¶ 35. Similarly, with respect to Nu-Tier, Woods stated that "[t]his is another account I need to hide behind Troy [Ward]," before describing his efforts (through Ward) to solicit business on behalf of PennStar and CPI from Nu-Tier, a Safety-Kleen Customer. *See* Drozdowski Aff., Exh. 1. In

describing those efforts, Woods disclosed confidential and valuable information that he had acquired about Nu-Tier by and through his employment with Safety-Kleen. *See id.*; Cekella Aff. at ¶ 35.[6]

On March 19, 2018 – two days after Woods's e-mail recounting his solicitation of Safety-Kleen Customers and disclosing the Company's Confidential Information – Deimer e-mailed Woods to acknowledge his receipt of the information that Woods had provided in the March 17 e-mail, and to thank him for providing it. *See* Drozdowski Aff., Exh. 2. The next day, Darrin Ward sent an e-mail to Deimer, Woods, and Perkins in which he approved Woods's future use of Troy Ward to assist him in soliciting the Customers that Woods had described soliciting in his March 17 e-mail – and Deimer responded with an e-mail stating his agreement to the scheme. *Id.*, Exs. 3 & 4.

**<u>Argument</u>**

Safety-Kleen is entitled to a preliminary injunction that prohibits Woods from continuing to breach his contractual non-solicitation and non-disclosure obligations, and that prevents PennStar and CPI from continuing to participate in, encourage, and benefit from Woods's violations of those obligations. The evidence available to date, even without discovery, establishes that Woods solicited Safety-Kleen Customers that he was barred from soliciting under the plain terms of his Agreement, that he was aware that his conduct was in violation of his Agreement, that he used and disclosed Confidential Information in connection with soliciting those Customers, and that he engaged in all of that misconduct not only for the benefit of but also at the direction and with the knowledge and assistance of PennStar and CPI. Safety-Kleen has already been harmed irreparably by Defendants' conduct, and it faces a very real threat that without an injunction their conduct will continue, thereby causing the Company to suffer even more substantial and irreparable harm.

---

[6] Safety-Kleen has redacted its confidential information from Exhibits 1-4 of the Drozdowski Affidavit, but will provide unredacted copies of those Exhibits at the hearing, for the Court's review in camera, or upon the Court's request.

To prevail on their request for a preliminary injunction under Fed. R. Civ. P. 65(a), Safety-Kleen must show (1) a likelihood of success on the merits of its claims, (2) that it will suffer irreparable harm without the requested injunctive relief, (3) a favorable balance of the hardships, and (4) "a fit (or, at least, a lack of friction) between the injunction and the public interest." *EEOC v. Astra USA, Inc.*, 94 F.3d 738, 742 (1st Cir. 1996); *see, e.g.*, *Largess v. Supreme Judicial Court*, 373 F.3d 219, 224 (1st Cir. 2004). Safety-Kleen's likelihood of success on the merits is the most important factor in the analysis. *See, e.g.*, *Lancor v. Lebanon Housing Auth.*, 760 F.2d 361, 362 (1st Cir. 1985). As we demonstrate below, that factor and all three of the others weigh heavily in favor of an injunction (a) prohibiting Woods for one year from directly or indirectly soliciting, diverting, appropriating (or attempting to solicit, divert, or appropriate) any Safety-Kleen Customer with whom he had Material Business Contact in the two-year period preceding the termination of his employment with the Company, (b) prohibiting Woods, PennStar, and CPI from using or disclosing any of Safety-Kleen's Confidential Information or Trade Secrets, and (c) prohibiting Woods, PennStar, and CPI from providing products or services to Circle, Total, ENI, Nu-Tier, or any other person or entity whom or which Woods directly or indirectly solicited, diverted, or appropriated (or attempted to solicit, divert, or appropriate) for or on behalf of PennStar or CPI in violation of his contractual obligations to Safety-Kleen for one year from the date of the Court's Order,

## I. Safety-Kleen Is Highly Likely To Succeed On The Merits Of Its Claims Against The Defendants.

In its Complaint, Safety-Kleen asserts claims against Woods for breach of contract, breach of the covenant of good faith and fair dealing, breach of fiduciary duty, and tortious interference with advantageous business relations, and against PennStar and CPI for tortious interference with contractual and advantageous business relations and unfair competition. *See* Complaint at ¶¶ 1-91. The evidence adduced thus far establishes that Safety-Kleen is likely to succeed on all of its claims;

in the interests of brevity, however, we focus below on the evidence establishing the Company's

high likelihood of success on its breach of contract and tortious interference claims.

### A. Safety-Kleen will succeed on the merits of its breach of contract claim against Woods.

The non-solicitation and confidentiality provisions of Woods's Agreement with Safety-

Kleen meet all of the requirements for enforceability under Massachusetts law.[7] Restrictive

covenants imposing post-employment non-solicitation and confidentiality obligations on employees

are fully enforceable in Massachusetts provided that they protect a legitimate business interest of

the employer, are supported by consideration, are reasonable in scope, and are otherwise consonant

with the public interest. *See, e.g.*, *Borden & Remington Corp. v. Banisch*, No. A9901270, 1999 WL

1266161, at *2-3 (Mass. Super. Ct. Oct. 18, 1999); *Bowne of Boston, Inc. v. Levine*, No. 97-5789-A,

1997 WL 781444, at *2-5 (Mass. Super. Ct. Nov. 25, 1997); *see also Analogic Corp. v. Data

Translation, Inc.*, 371 Mass. 643, 647 (1976). Here, the non-solicitation and non-disclosure

provisions of the Agreement protect Safety-Kleen's customer goodwill and confidential information

– both of which are legitimate business interests of the Company[8] – and are narrowly-tailored to

achieve that goal. Further, the Agreement is supported by consideration, including but not limited to

Woods's continued employment with Safety-Kleen. Finally, enforcing the Agreement is consistent

with the public interest, because it will allow Safety-Kleen to conduct its business without

interference by Woods's improper conduct in violation of his contractual obligations.

1. Safety-Kleen has a legitimate business interest in protecting its customer good will and confidential information.

The protection of confidential information, trade secrets, and good will all constitute

legitimate business interests that are sufficient to support post-employment restrictive covenants.

---

[7] We analyze the Company's breach of contract claim under Massachusetts law, because the Agreement provides that it "shall be construed and regulated under and by the laws of the State of Massachusetts." *See* Cekella Aff., Exh. 1 at 5.
[8] *See, e.g.*, *Borden & Remington Corp.*, 1999 WL 1266161, at *3-4 (identifying protection of confidential information and customer good will as legitimate business interests sufficient to justify a post-employment restrictive covenant).

*See Boulanger v. Dunkin' Donuts, Inc.*, 442 Mass. 635, 641 (2004). Confidential information is protectable as such if an employer takes reasonable steps to preserve its secrecy. *Id.* at 642; *see also USM Corp. v. Marson Fastener Corp.*, 379 Mass. 90, 100-01 (1979) (efforts to protect information need not be "heroic," but rather merely reasonable in light of the circumstances). The confidential information that may legitimately be protected by a restricted covenant is not limited to patented formulas or highly technical data, and includes financial, sales, and strategic business information. *See, e.g.*, *Boulanger*, 442 Mass. at 642; *see also Bard v. Intoccia*, No. 94-11568Z, 1994 WL601944, at *3 (D. Mass. Oct. 13, 1994) (information is confidential and may be protected by an agreement even though "it does not represent a major scientific breakthrough or, in a technical sense, a trade secret"). Likewise, goodwill – i.e., a company's positive reputation in the eyes of its customers, potential customers, and the community generally – is "considered a legitimate business interest that an employer is entitled to protect." *Borden & Remington Corp.*, 1999 WL 1266161, at *3.

Safety-Kleen maintains a number of categories of Confidential Information, as defined by the Agreement. These include, among other things, confidential and proprietary information about the Company's customers, including without limitation their preferences and requirements, as well as the Company's sales and marketing strategies, its sales records and marketing data, its business plans, and its technical expertise and know-how. *See* Cekella Aff. at ¶ 9. This information is valuable to Safety-Kleen and its competitors, is not known outside of the Company, and cannot easily be properly acquired or duplicated by others. *See id.* at ¶ 10. In addition, Safety-Kleen has made substantial and commercially reasonable efforts to protect the information by, among other things, requiring employees with access to it to sign confidentiality agreements, adopting policies defining and restricting the use and disclosure of confidential information (and requiring employees to certify that they have read and understood those policies), instituting data access protections (e.g., password-protected computer and data systems), restricting access to its facilities, and restricting

employees' access to electronic and other data on a need-to-know basis. *See id.* at ¶ 11. Courts regularly hold that the protection of such information constitutes a legitimate business interest. *See, e.g.*, *Boulanger*, 442 Mass. at 641-42.

Safety-Kleen has generated and maintained good will with the customers and potential customers covered by the non-solicitation provision of its Agreement with Woods. Indeed, while Woods was employed with Safety-Kleen, the Company provided him with the means and opportunity to contact, meet with, and develop relationships with those customers and potential customers, and it hired Woods to use his knowledge, skill, and personality to further cultivate and manage its relationships with them on behalf of the Company. *See* Cekella Aff. at ¶ 24 & Exh. 1. Accordingly, the business that Safety-Kleen hired Woods to perform on its behalf involved good will belonging to the Company, and Woods is in a position to appropriate it on behalf of himself and his new employer. *See, e.g.*, *All Stainless, Inc. v. Colby*, 364 Mass. 773, 774-77 (1974); *Bowne of Boston*, 1997 WL 781444, at *3.

There is no question, furthermore, that Woods had access to Safety-Kleen's confidential and proprietary information, and to its customer good will. Indeed, as a Distributor Sales Executive for the Company, Woods had (password-protected) access to Safety-Kleen's customer management system, SalesForce, which contained highly confidential and proprietary information about the Company's customers and prospective customers, including contact information for key decision makers, information concerning Safety-Kleen's past marketing efforts and future marketing plans with respect to them, and information concerning past sales made and pricing offered to and accepted by them. *See* Cekella Aff. at ¶ 15. In addition, Woods had access to information about the Company's sales projections and plans with respect to certain of its customers and prospective customers, as well as its business plans and technical know-how. *See id.* at ¶ 14. And of course, as a

salesperson, Woods had direct and regular access to and communications with the Company's customers and prospective customers. *See id.*

Finally, the evidence establishes that Woods has already violated his obligations under the Agreement. The plain terms of that Agreement provide that Woods may not,

> for a period of one (1) year following the voluntary resignation . . . of [his] employment, . . . on behalf of [himself] or for any Competing Business, directly or indirectly solicit, divert, or appropriate , or attempt to solicit, divert, or appropriate any Customer with whom [he] had Material Business Contact in the two (2) year period preceding the termination of [his] employment, for the purposes of providing services that are the same as or substantially similar to those provided in the Business of [the Company].

*See id.*, Exh. 1 at 4 (Section 5). Woods's March 17, 2018 e-mail establishes that within three months of his resignation from Safety-Kleen, he solicited (or attempted to solicit) business from at least four of its Customers – Circle, Total, ENI, and Nu-Tier – on behalf of PennStar and CPI. *See* Drozdowski Aff., Exh. 1; Cekella Aff. at ¶ 35. There is no question that PennStar and CPI are "Competing Business[es]," as that term is defined in the Agreement, because they are "directly engaged in whole or in relevant part" in the business of providing high performance oils and lubricants for industrial and automotive applications, which is part of the Business of the Company. *See* Cekella Aff. at ¶¶ 7-8 & Exh. 1 at 1-2; *see also* Curran Aff., Exhs. 2-4. The evidence further establishes that Woods had "Material Business Contact" with Circle, Total, ENI, and Nu-Tier within the two-year period before his employment with Safety-Kleen ended, and that he solicited (or attempted to solicit) them for the purpose of providing them with oils and lubricants for industrial or automotive applications, which is one of the services "provided in the Business" of Safety-Kleen. *See* Cekella Aff. at ¶ 19-21 & Exh. 1 at 2, 3; *see also* Drozdowski Aff., Exh. 1.

The evidence also demonstrates that Woods violated his obligation under the Agreement not to use or disclose the Company's Confidential Information. Indeed, the March 17, 2018 e-mail shows that Woods not only used Safety-Kleen's Confidential Information about Circle and Nu-Tier

in his efforts to solicit business from them for the Company's competitors, PennStar and CPI, but also that he disclosed Confidential Information to Messrs. Deimer and Ward – both of whom are officers of those competitor-entities. *See* Drozdowski Aff., Exh. 1; Cekella Aff. at ¶ 35 & Exhs. 2-3.

### 2. The Agreement is supported by consideration.

Woods executed the Agreement "in consideration of the Company's . . . continued employment," as well as his "participation in the Company's 2017 Kleen Performance Products Variable Pay Plan" and other consideration. *See* Cekella Aff., Exh. 1 at 1. It is well-established that continued employment is sufficient consideration to support a restrictive covenant agreement in Massachusetts. *See, e.g.*, *Optos, Inc. v. Topcon Med. Sys., Inc.*, 777 F. Supp. 2d 217, 231 (D. Mass. 2011); *Inner-Tite Corp. v. Brozowski*, No. 20100156, 2010 WL 3038330, at *16 (Mass. Super. Ct. Apr. 14, 2010); *EMC Corp. v. Donatelli*, No. 091727BLS2, 2009 WL 1663651, at *6 (Mass. Super. Ct. May 5, 2009). Accordingly, the Agreement is supported by adequate consideration.

### 3. The Agreement's non-solicitation and non-disclosure covenants are reasonable in scope and duration.

Under his Agreement with Safety-Kleen, Woods's non-solicitation obligations are strictly limited in scope to entities (1) that qualify as "Customers" of the Company, and (2) that Woods had "Material Business Contact" with during the two-year period preceding the termination of his employment with the Company. *See* Cekella Aff., Exh. 1 at 4 (Section 5).[9] The scope of the restriction is therefore limited only to those customers with whom Woods had relevant contact on behalf of Safety-Kleen during the two years before he left the Company, and thus is narrowly-tailored to protect the Company's good will with those customers that Woods had access to and benefitted from as a Safety-Kleen salesperson. *See, e.g., All Stainless*, 364 Mass. at 777 (observing

---

[9] "Customers," as defined in the Agreement, include only those individuals or entities for whom the Company "has provided or does provide products or services in connection with " its Business, or whom it has provided with "written proposals" concerning its Business "in the two (2) year period preceding the termination of" Woods's employment with the Company. *See* Cekella Aff., Exh. 1 at 3. The term "Material Business Contact" is defined to include only "contact that is intended to establish or strengthen a business or professional relationship" for the Company. *See id.*, Exh. 1 at 3.

that "because [a former employer's] principal contact with customers was through its outside salesman, the good will of [the former employer] could be harmed by a former salesman's calling on [the former employer's customers], with whom he had previously dealt, to solicit purchases."). The bar on solicitation, moreover, lasts only one year following the termination of his employment with the Company, and it does not apply to all solicitation (or attempted solicitation) of Customers with whom Woods had Material Business Contact, but rather only to solicitation (or attempted solicitation) "for the purposes of providing services that are the same as or substantially similar to those provided" in the Company's Business. *See* Cekella Aff., Exh. 1 at 4 (Section 5); *see also Aspect Software, Inc. v. Barnett*, 787 F. Supp. 2d 118, 128 (D. Mass. 2011) (observing that Massachusetts courts "have upheld non-compete terms significantly longer than one year.")[10]

Similarly, Woods's non-disclosure obligations under the Agreement extend only to the Company's Confidential Information and Trade Secrets, as those terms are specifically and narrowly defined in the Agreement.[11] Here, moreover, Safety-Kleen is seeking to enforce the Agreement's non-disclosure obligations only as to the highly sensitive information about the Company's customers that, if made known to Safety-Kleen competitors like PennStar and CPI, would provide the competitor with a distinct competitive advantage in selling to those customers. *Cf. All Stainless*, 364 Mass. at 778-81 & n.3 (holding that restrictive covenant agreements are enforceable to the extent reasonable, and enforcing an overly-broad restrictive covenant agreement after narrowing its scope to make it reasonable). Further, because confidential information and trade secrets are entitled to protection "as long as they remain secret," the indefinite protection that the

---

[10] *Cf. Blackwell v. E.M. Helides, Jr., Inc.*, 368 Mass. 225, 229 (1975) (upholding 3-year non-competition covenant); *Oxford Global Resources, Inc. v. Consolo*, No. CA024763BLS2, 2002 WL 32130445, at *6 (Mass. Super. Ct. May 6, 2002) (enforcing 12-month non-solicitation covenant)

[11] "Confidential Information" is defined to include only information (i) that is competitively sensitive, (ii) that is of importance to the Company, (iii) that becomes known to Woods through his employment with the Company, and (iv) that is not a trade secret under applicable law. The term "Trade Secrets" means information "defined as a trade secret by Massachusetts trade secrets law, the Defend Trade Secrets Act, or other applicable law. *See* Cekella Aff., Exh. 1 at 2-3.

Agreement affords to the Company's trade secrets and confidential information is reasonable. *See* 1 Melvin F. Jager, Trade Secrets Law § 6:4 (2015).

Finally, enforcing the Agreement's non-disclosure covenant and its one-year limitation on Woods's solicitation of certain Safety-Kleen customers will not significantly affect his ability to earn a living. Indeed, he may freely compete with Safety-Kleen, and even solicit its customers, so long as he does not use or disclose the Company's Confidential Information or Trade Secrets in doing so, and provided that he does not (for one year) solicit those with whom he had Material Business Contact during his final two years at the Company. *See, e.g.*, *Darwin Partners v. Signature Consultants, LLC*, No. 00-0277, 2000 WL 33159238, at *4 (Mass. Super. Ct. Mar. 24, 2000) (enforcing 1-year non-solicitation covenant in part because it did not bar employee from competing with his former employer). Accordingly, the non-solicitation and non-disclosure covenants that Safety-Kleen is seeking to enforce against Woods are reasonable in scope and fully-enforceable.[12]

### B. Safety-Kleen will succeed on the merits of its tortious interference claims.

To establish a claim for tortious interference with contractual or advantageous business relations, Safety-Kleen must show (1) the existence of a contract or a business relationship that contemplated economic benefit, (2) Defendants' knowledge of the contract or business relationship, (3) Defendants' intentional interference with the contract or business relationship for an improper purpose or by improper means, and (4) harm or damages. *See, e.g.*, *Swanset Dev. Corp. v. City of Taunton*, 423 Mass. 390, 397 (1996); *United Truck Leasing Corp. v. Geltman*, 406 Mass. 811, 812, 815-17 (1990).[13] Here, the evidence shows that Safety-Kleen had both contractual and advantageous business relations with Woods and with its Customers. *See* Cekella Aff. at ¶¶ 19-24,

---

[12] The non-solicitation and non-disclosure provisions to which Woods agreed are consistent with the public interest, and thus also satisfy the fourth and final prerequisite to enforceability under Massachusetts law. *See* Section IV, *supra*.

[13] To the extent that New York law applies to Safety-Kleen's tortious interference claims, the standard is similar, except that no showing of improper or "culpable" conduct by the defendants is required in the event of an alleged interference in a contractual relationship. *See, e.g.*, *Steinberg v. Schnapp*, 899 N.Y.S. 2d 167, 170 (N.Y. App. Civ. 2010).

& Exh. 1. The evidence also establishes that the Defendants were aware of those contractual and business relations, and that they intentionally interfered with them by (in Woods's case) soliciting business from Safety-Kleen Customers that he knew he was barred from soliciting on behalf of anyone other than Safety-Kleen, and (in the case of the other Defendants) directing, facilitating, and encouraging Woods to solicit business on their behalf and away from Safety-Kleen from the Company's Customers, and in violation of his acknowledged contractual obligations to Safety-Kleen. *See* Drozdowski Aff., Exhs. 1-4. In doing so, furthermore, the Defendants were seeking to benefit unfairly and improperly from Safety-Kleen's goodwill and confidential information, to the detriment of Safety-Kleen. Accordingly, Safety-Kleen is likely to prevail on its claims against the Defendants for tortious interference with contractual or advantageous business relations.[14]

## II.     Safety-Kleen Will Suffer Irreparable Harm If An Injunction Is Not Issued.

Courts routinely conclude that an ex-employee's breach of an enforceable restrictive covenant agreement causes irreparable harm to the employer, particularly where (as here) the restrictive covenant agreement is designed to protect the employer's legitimate interest in protecting its confidential information. *See, e.g.*, *Aspect Software*, 787 F. Supp. 2d at 130 (observing that "[a]s a general rule, a breach of non-compete agreements tied to trade secrets concerns triggers a finding of irreparable harm"). Similarly, courts recognize that "the potential harm caused by solicitation" in violation of a non-solicitation covenant "is difficult to quantify and remedy," and they have as a result "routinely accepted the threat of future solicitation as an irreparable harm." *Advanced Micro-Devices v. Feldstein*, No. CV 13-40007-TSH, 2013 WL 10944934, at *12 (D. Mass. May 15, 2013).

Thus, to demonstrate irreparable harm in this context, Safety-Kleen need only demonstrate a strong possibility of future solicitation, or that it will suffer a future loss of its confidential

---

[14] *See, e.g.*, *Hilb Rogal & Hobbs of Mass. LLC v. Sheppard*, No. 07-5549-BLS2, 2007 WL 5390399 (Mass. Super. Ct. Dec. 31, 2007); *W.B. Mason Co. v. Staples, Inc.*, 2001 WL 227855, at *7-8 (Mass. Super. Ct. Jan. 18, 2001); *cf. John G. Ullman & Assocs., Inc. v. BCK Partners, Inc.*, 2015 WL 7211066, at *2 (N.Y. Sup. Ct. Nov. 6, 2015).

information or good will. *See id.*; *see also K-Mart Corp. v. Oriental Plaza, Inc.*, 875 F.2d 907, 915 (1ˢᵗ Cir. 1989); *Marcam Corp. v. Orchard*, 885 F. Supp. 294, 297-098 (D. Mass. 1995); *Kroeger v. Stop & Shop Co.*, 13 Mass. App. Ct. 310, 322 (1982); *Darwin Partners*, 2000 WL 33159238, at *5. Here, the evidence developed to date, without the benefit of discovery, establishes that Woods has already solicited several of the Safety-Kleen customers whom he is barred from soliciting by his Agreement, and that the other Defendants have knowingly directed, facilitated, and participated in that conduct. *See* Drozdowski Aff., Exhs. 1-4. In *Advanced Micro-Devices*, the court held that the plaintiff had sufficiently demonstrated a likelihood of irreparable harm sufficient to justify a preliminary injunction enforcing a non-solicitation agreement against its former employee because, "given [his] alleged past solicitation" in violation of the agreement, he would likely engage in such solicitation in the future. 2013 WL 10944934, at *12; *see also Darwin*, 2000 WL 33159238, at *5 (finding irreparable harm based on potential for future loss of good will and confidential information based upon former employee's known solicitation of former employer's customers).

Accordingly, Safety-Kleen will suffer irreparable harm if Defendants are not enjoined from soliciting the Safety-Kleen Customers that the Agreement bars Woods from soliciting, and from using or disclosing Safety-Kleen's Confidential Information. A preliminary injunction is necessary to prevent this unlawful harm to Safety-Kleen's business.

## III.    The Substantial Risk of Irreparable Harm to Safety-Kleen Outweighs Any Risk Of Harm To Defendants.

Where, as here, preliminary injunctive relief "does little more than enjoin [the defendants] from engaging in activities from which they are already contractually barred," the balance of the equities favors the plaintiff. *See Advanced Micro Devices*, 2013 WL 10944934, at *13. Furthermore, the Defendants have no right to retain or benefit from the use or disclosure of Safety-Kleen's Confidential Information, or to engage in (or direct, facilitate, and participate in) conduct

19

that is in violation of Woods's contractual obligations, so enjoining them from doing those things will not cause them to suffer any cognizable harm. *See, e.g.*, *In re Zyprexa Injunction*, 474 F. Supp. 2d 385, 425 (E.D.N.Y. 2007). Indeed, Woods faces little if any harm from the enforcement of his Agreement because, even after the injunction enters, he may continue working for the other Defendants in the industrial and automotive lubricants industry, "using [his] skills and experience" in direct competition with Safety-Kleen. *See, e.g.*, *Darwin*, 2000 WL 33159238, at *5 (enforcing non-solicitation agreement that, like Woods's, prohibited solicitation of "only those corporate client accounts with whom the individual defendant[] had contact"); *see also Marine Contractors Co.*, 365 Mass. at 289. Accordingly, the balance of hardships tips clearly and decisively in favor of an order granting this Motion and entering Safety-Kleen's requested preliminary injunction.

## IV.    Preliminary Injunctive Relief Will Not Harm The Public Interest.

Enjoining Defendants' conduct will not harm the public interest. To the contrary, the public interest favors enforcing valid agreements that protect legitimate business interests. *See, e.g.*, *Boston Celtics Ltd. P'Ship. v. Shaw*, 908 F.2d 1041, 1049 (1st Cir. 1990); *Iron Mountain Info. Mgmt., Inc. v. Viewpointe Archive Servs., LLC*, 707 F. Supp. 2d 92, 112 (D. Mass. 2010); *Bio-Imaging Techs. Inc. v. Marchant*, 584 F. Supp. 2d 322, 330 (D. Mass. 2008); *Stone Legal Res. Group, Inc. v. Glebus*, No. CA025136, 2003 WL 914994, at *6 (Mass. Super. Ct. Dec. 16, 2002); *see also Avaya, Inc. v. Ali*, No. CIV.A. 12-10660-DJC, 2012 WL 2888474, at *9 (D. Mass. July 13, 2012) (ruling that the public interest favors and is served by an order "protecting trade secrets and customer goodwill and ensuring that legally enforceable contracts are in fact enforced").

## Conclusion

For all of the foregoing reasons, Plaintiff Safety-Kleen Systems, Inc. respectfully requests that the Court grant its Motion for Preliminary Injunction, and that it issue a preliminary injunction in the form attached to Safety-Kleen's Motion.